## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| ) | |
| v.  ) | Criminal Action No. 2020-0005 |
| ) | |
| VONNE BAILEY,  ) | |
| ) | |
| **Defendant.**  ) | |
| ) | |

**Attorneys:**
**Melissa P. Ortiz, Esq.,**
St. Croix, U.S.V.I.
  *For the Government*

**Gabriel J. Villegas, Esq.,**
St. Thomas, U.S.V.I.
  *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Vonne Bailey's ("Defendant") "Motion to Suppress" (Dkt. No. 16); the Government's Opposition thereto (Dkt. No. 18); the evidence and arguments presented at the suppression hearing; Defendant's "Supplemental Brief to Motion to Suppress" ("Supplement") (Dkt. No. 36); and the Government's Response thereto (Dkt. No. 41). For the following reasons, the Court will deny Defendant's Motion to Suppress.

### I.   BACKGROUND

On March 17, 2020, the Government filed an Information against Defendant charging him with Possession of Cocaine with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (Dkt. No. 12).[1]

---

[1] Prior to filing the Information, the Government commenced this action by filing a Criminal Complaint on March 9, 2020. (Dkt. No. 1).

1

On April 3, 2020, Defendant filed a motion seeking to suppress all physical evidence seized and statements made in this matter. (Dkt. No. 16). During the subsequent suppression hearing, the Government presented the testimony of two witnesses: Officer Jason Viveros ("Officer Viveros") from Customs and Border Protection ("CBP") and Special Agent Christopher McGrath ("Agent McGrath") from Homeland Security Investigations ("HSI"). Defendant testified on his own behalf. The following evidence emerged from the testimony of the three witnesses.[2]

On March 7, 2020, CBP officers contacted HSI special agents regarding an encounter with Defendant at the Henry E. Rohlsen Airport on St. Croix, U.S. Virgin Islands. (Hr'g Tr. at 31). Defendant was a passenger on an outbound commercial American Airlines flight destined for Miami, Florida. *Id*. at 9. Officer Viveros was conducting an inspection of checked luggage being loaded into the front luggage compartment of the aircraft. *Id*. at 20. According to Officer Viveros, when selecting baggage to search, he looks for anomalies such as smaller, carry-on bags that have been checked, bags emitting odors, and very heavy bags. *Id*. at 17. Officer Viveros testified that during the inspection he selected a black and purple duffel bag to search—removing it from the conveyer belt on the baggage ramp *Id*. at 18. This bag was relatively small in comparison to the other bags that were being loaded as checked luggage, which is why Officer Viveros selected it for inspection. *Id*.

Officer Viveros and one other CBP officer inspected the duffel bag and found a black towel inside. *Id*. at 20. Unfolding the towel revealed two vacuum sealed brick-shaped packages wrapped in plastic wrap that had a "glittery" substance covering them. *Id*. Based on his training and

---

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

experience, Officer Viveros suspected that these packages contained illegal contraband because narcotics are often transported in vacuum sealed packages. *Id*. at 21. Officer Viveros notified his supervisor, who created a small incision in the package. *Id*. at 22. A white powdery substance began to come out of the package. *Id*.

Officer Viveros and his supervisor then contacted an American Airlines representative. *Id*. Officer Viveros' supervisor showed the representative the duffel bag's baggage tag and informed the representative that they needed to see the individual who "matched" the baggage tag. *Id*. at 22-23. The representative located the seat number of the individual and directed Officer Viveros and his supervisor to enter the aircraft. *Id*. at 23. Inside of the aircraft, the representative approached Defendant—the individual to whom the baggage tag was matched—while Officer Viveros and his supervisor remained towards the back of the aircraft. *Id*. The representative asked Defendant to follow her to the back of the plane. *Id*. at 79. Officer Viveros then approached Defendant and asked for his identification to confirm that he was the individual to whom the duffel bag belonged. *Id*. at 24.

Defendant was escorted to the CBP secondary inspection area inside of the airport—a large room with three doors, a long window, two tables, and a counter. *Id*. at 25.[3] In the secondary inspection area, Office Viveros asked Defendant questions regarding his luggage. *Id*. at 26. Defendant was asked: "Is this your bag?" and "Did you pack the bag yourself?" Defendant responded "yes" to these questions. *Id*. at 27. He was then asked: "Are you carrying anything for anyone?" to which Defendant replied "no." *Id*. After Defendant answered the three questions,

---

[3] During the suppression hearing, there was a disagreement over whether Defendant was handcuffed at this time, which prompted the Court to direct the Government to provide a video tape of the interaction if one existed. (Hr'g Tr. at 109). The Government subsequently filed a "Notice Regarding Existence of Secondary Room Video," stating that "no videotape exists of the secondary inspection area of the Henry E. Rohlsen Airport on March 7, 2020." (Dkt. No. 34).

3

Officer Viveros removed the items that were inside the duffel bag and conducted a field test using a test kit to identify the white powdery substance. *Id*. at 29. The field test yielded a positive result for cocaine. *Id*. at 30. After observing the positive result, Officer Viveros testified that he turned to Defendant and advised him that the contents of the brick tested positive for cocaine. *Id*. Defendant told Officer Viveros that it was supposed to be soap. *Id*. at 30. Officer Viveros replied that he did not know what it was supposed to be, but that it tested positive for cocaine. *Id*. at 30-31. Defendant reiterated that it was supposed to be soap—that he had bought it at "My Lord," which is a local variety store. *Id*. at 31.

According to Officer Viveros, Defendant "seemed relaxed" throughout the encounter. *Id*. at 28, 34. At the time of the questioning, Officer Viveros was wearing his uniform and his gun was visible in a holster on the right side of his waist. *Id*. at 26. Officer Viveros testified that he never took his gun out of the holster or yelled at Defendant during the course of the interaction. *Id*. at 27, 29. Officer Viveros further testified that there were between three and four officers present in the secondary inspection area; Defendant was not handcuffed; and Defendant was in the secondary inspection area for approximately two and a half hours. *Id*. at 34, 62-68. Defendant testified, on the other hand, that there were between four and five officers present in the secondary inspection area; he was handcuffed with his hands behind his back; and he was in the secondary inspection area for approximately three to four hours. *Id*. at 81-84.

HSI agents were called and notified about the situation. *Id*. at 32. According to Agent McGrath, he arrived at the airport approximately an hour and a half after getting called, and that when he arrived Defendant "seemed calm and relaxed." *Id*. at 65, 68. He testified that he spoke with the CBP officers and then placed Defendant in handcuffs. *Id*. at 67-68, 71. Agent McGrath then transported Defendant to the HSI office at St. George's Hill for processing. *Id*. at 67-68.

According to Agent McGrath, once they arrived at the HSI office, he read Defendant his *Miranda* rights. *Id*. at 72. Defendant invoked his right to counsel; questioning immediately ceased; and HSI agents finished processing him. *Id*. Defendant testified that he was at St. George's Hill for approximately one hour to one hour and a half. *Id*. at 86-87.

Defendant argues that he was seized in violation of the Fourth Amendment; that his statements were taken in violation of *Miranda*; and that his statements were involuntary. (Dkt. Nos. 16, 36). In response, the Government argues that the search of Defendant's luggage was reasonable, lawful, and valid; Defendant was not in custody for purposes of *Miranda*; Defendant was not interrogated for purposes of *Miranda*; and that Defendant's statements were not involuntary. (Dkt. Nos. 18, 41).

## II.     APPLICABLE LEGAL PRINCIPLES

### A.     Search and Seizure

The Fourth Amendment prohibits government agents from conducting unreasonable searches and seizures. *United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994) (citing *Harris v. United States*, 331 U.S. 145, 150 (1947)). Whether a search and seizure is reasonable "depends upon all of the circumstances surrounding the search and seizure and the nature of the search and seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Although a warrantless search is generally considered presumptively unreasonable, the courts recognize exceptions to the warrant requirement in "certain limited situations." *Hyde*, 37 F.3d at 118 (citing *Horton v. California*, 496 U.S. 128, 133 (1990) and *Montoya*, 473 U.S. at 537); *see also United States v. Baxter*, 951 F.3d 128, 132, 72 V.I. 1183 (3d Cir. 2020). "Border searches are one such exception." *Id.* The government's "authority to conduct routine searches and seizures at the border, without probable cause or a warrant," for the purpose of levying duties and intercepting contraband

5

is well-recognized. *Montoya*, 473 U.S. at 537 (citing *United States v. Ramsey*, 431 U.S. 606, 616-617 (1977)).

Two conditions must be met for the border exception to apply. First, the search or seizure must occur at the "physical boundaries of the nation" or its "functional equivalent." *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir. 1985) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973)). The Third Circuit has examined the issue of whether the Henry E. Rohlsen airport is the "functional equivalent" of a national border for purposes of a Fourth Amendment analysis, with respect to persons and items leaving St. Croix and entering the continental United States. *Hyde*, 37 F.3d at 117. Finding the government's interest "in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders," the *Hyde* Court held "that routine customs searches of persons and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment." *Id.* at 117, 122. As such, with respect to individuals traveling from St. Croix to the continental United States, the Henry E. Rohlsen airport is the "functional equivalent" of an international border for purposes of a Fourth Amendment analysis.

Second, the search or seizure must be routine for the border exception to apply. *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008) ("Provided that a border search is routine, it may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing.") (citing *Montoya*, 473 U.S. at 538 and *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir. 1985)). "[C]ertain searches, classified as 'nonroutine,' require reasonable suspicion of wrongdoing to pass constitutional muster." *Id.* (citing *Montoya*, 473 U.S. at 541). To distinguish between routine and non-routine searches, "[c]ourts have focused on the privacy interest

and the intrusiveness and indignity of the search." *Id.* (citing *United States v. Cardenas*, 9 F.3d 1139, 1148 n.3 (5th Cir. 1993) and *United States v. Vega-Barvo*, 729 F.2d 1341, 1344-46 (11th Cir. 1984)). The Third Circuit recognizes "patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search" as routine searches. *Id.* at 485-86. Non-routine searches include "body cavity searches, strip searches, and x-ray examinations . . . by virtue of their significant intrusion on an individual's privacy." *Id.* at 486.

**B.**     ***Miranda***

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 44. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

However, "normal *Miranda* rules are . . . inapplicable to circumstances where border inspectors question persons seeking entry into the United States." *United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) (citing *United States v. Kiam*, 432 F.3d 524, 529-30 (3d Cir. 2006)). In *Kiam*, the Third Circuit examined at length the application of *Miranda* rules in the context of immigration inspections at international borders, holding that "normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id.* at 529 (citing *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999)). Immigration and customs officers have a responsibility to inspect entrants at our borders, and "[s]uspicion of criminal conduct cannot overrule [that] simultaneous responsibility . . . ." *Id.* at 531 (citing *United States v. Silva*, 715 F.2d 43, 48 (2d Cir. 1983) (holding that customs officers were "duty-bound to determine whether the defendant was entitled to enter the

7

country with her effects" regardless of their suspicion of criminal conduct, and *Miranda* warnings were not required).

Further, an individual seeking to enter the United States "does *not* have a right to remain silent." *Id.* at 529 (citing *Gupta*, 183 F.3d at 617). As such, individuals seeking to enter the United States may be questioned without *Miranda* warnings even if subject to custody and may be "taken out of a primary inspection line for secondary questioning . . . ." *Id.* at 529-30 (citing *Gupta*, 183 F.3d at 617-18). While *Kiam* specifically addressed immigration screening at international borders, a panel of the Third Circuit has applied *Kiam*'s holding to the customs inspection context. *St. Vallier*, 404 F. App'x at 656 n.4. ("[W]e find no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.").

The Third Circuit has recognized that even in the border context, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). Where an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . this line has been crossed." *Id.* This line is not crossed, however, where there is mere overlap between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution. *St. Vallier*, 404 F. App'x at 657 (noting "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity" and holding that "questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*"); *see also United States v. Barrett*, 2011 WL 4443432, at *8 (D.V.I. Sept. 22, 2011) (finding that "all the questions asked

8

by [an officer] up until the point where he discovered drugs on the defendant's person were permissible in that [they] were a means of determining whether the defendant or his effects were admissible and did not relate solely to criminal prosecution for drug offenses"). However, "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution." *St. Vallier*, 404 F. App'x at 658 (citing *Kiam*, 432 F.3d at 530 n.6).

### C. Voluntariness of Statements

In determining the voluntariness of a statement, a court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). "[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz*, 162 Fed. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (internal quotation marks omitted). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the [statement.]" *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (internal citation omitted). The Government bears the burden of establishing voluntariness by a preponderance of the evidence. *Id*.

### III. DISCUSSION

#### A. Legality of Search and Seizure

Defendant seeks the suppression of all tangible evidence recovered by CBP officers following their detention of Defendant and search of his luggage. (Dkt. No. 16). Defendant argues that the officers "seized [him] without the requisite reasonable suspicion as there were no facts present at the time of [Defendant's] seizure which would indicate to the officers that they were justified in searching or detaining him." *Id*. at 3. Defendant also asserts that the border exception

9

does not apply here because the interaction took place after he made it through security without incident, boarded the plane, and was awaiting departure. (Hr'g Tr. at 98-99; Dkt. No. 36 at 9-11). Based on this latter premise, Defendant characterizes the incident as an "unreasonable non-routine border seizure . . . ." (Dkt. No. 36 at 9). He maintains that he "submitted to law enforcement's show of authority when he was instructed to leave the plane . . . ."; that "[l]aw enforcement induced cooperation by coercive means"; and that he was taken to a room, handcuffed, questioned, and detained for three to four hours. *Id*. at 9-10. While the Government disputes that Defendant was handcuffed when he was taken to the secondary inspection area and that he was detained for three to four hours, the Government maintains, in any event, that what occurred was a valid routine border search of luggage. (Dkt. Nos. 18 at 3; 41 at 4-5).

As discussed above, the Third Circuit has determined that the border exception to the Fourth Amendment's prohibition on unreasonable searches and seizures applies with respect to an individual departing from the Henry E. Rohlsen airport for the continental United States. *See Hyde*, 37 F.3d at 117. As such, no warrant, probable cause, or reasonable suspicion is necessary when CBP officers subject individuals to detention and a routine search at the airport. Because the Third Circuit has recognized that a routine border search includes a luggage search by Customs officials, the Court finds that Defendant's Fourth Amendment rights were not implicated by the CBP officers' search of his baggage. *See Whitted*, 541 F.3d at 485-86. Nothing in the record indicates that the CBP officers took any action that was so highly intrusive as to convert the routine border search into a non-routine search. *See id*. at 486 (identifying limited instances in which a search becomes "nonroutine by virtue of [its] significant intrusion on an individual's privacy.").

Defendant has presented no authority for the novel proposition that the border exception ceases to apply once an individual has made it through security without incident, boarded the plane,

and is awaiting departure. Indeed, there is nothing to suggest that the line of demarcation that Defendant seeks to draw creates a legitimate separation between the circumstances "involving neither a high expectation of privacy nor a seriously invasive search" *id*. at 485-86, and those involving the kind of "significant intrusion on an individual's privacy" *id*. at 486, akin to a body cavity or strip search. Rather, given the rationale underlying the border exception—that searches of persons and items at the border are presumptively reasonable because of the Government's interest in preventing the movement of contraband across the border—the Court sees no legitimate justification for limiting the application of the border exception as Defendant suggests. Nor do the existing case authorities support Defendant's assertions. *See, e.g.*, *Kiam*, 432 F.3d at 530 (border exception applied after the defendant landed in the United States and was removed from the plane for questioning before reaching the initial line); *United States v. Ezeiruaku*, 936 F.2d 136 (3d Cir. 1991) (border exception applied to the search of luggage even after it has been transported outside of the airport terminal); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982) (border exception applied when the defendant was stopped when proceeding up a ramp to board a plane bound for a foreign country); *United States v. Stevens*, 2008 WL 1777403 (D.V.I. Apr. 16, 2008) (border exception applied when all the passengers in an aircraft were directed to disembark so that CBP officers could locate and search the defendant's luggage). Thus, the fact that Defendant was seized from the airplane at law enforcement's direction and escorted to the secondary area does not render the border exception inapplicable.[4]

---

[4] Even if Defendant was handcuffed while in the secondary inspection area, with four or five armed officers in the room, for three or four hours as Defendant claims, this would not alter the Court's conclusion. *See United States v. Henry*, 2018 WL 547266 (D.V.I. Jan. 23, 2018) (border exception applied to an hours-long interaction in which between two and four officers were present and the defendant was removed from the boarding area, handcuffed, and escorted to the secondary inspection area). In any event, the Court credits the testimony of Officer Viveros and Agent McGrath that Defendant was not handcuffed during the encounter with CBP officers and while

In sum, because the Court finds that the CBP officers performed a routine border search, and thus Defendant's Fourth Amendment rights were not implicated, the Court will deny Defendant's request to suppress all tangible evidence discovered as a result of the search.

### B. Applicability of *Miranda*

Defendant seeks the suppression of all statements he made to CBP officers on the grounds that he was subjected to custodial interrogation without being provided *Miranda* warnings. (Dkt. No. 16).[5] The Government responds, *inter alia*, that Defendant was not interrogated for Miranda purposes, arguing that CBP officers only questioned him regarding the ownership of the bag and packing the bag. (Dkt. No. 18 at 7).

The evidence in the record establishes that, after Defendant was escorted to the secondary inspection area, Officer Viveros asked Defendant: "Is this your bag?"; "Did you pack the bag yourself?"; and "Are you carrying anything for anyone?" Defendant responded that the bag was his; that he packed the bag himself; and that he was not carrying anything for anyone. Officer Viveros testified that he asked these questions to ascertain whether the bag in fact belonged to Defendant. Defendant was not advised of his *Miranda* rights before Officer Viveros questioned him. After Officer Viveros questioned Defendant, he performed a field test on the contents of the duct-taped packages. The contents of the packages tested positive for cocaine. Officer Viveros did not ask Defendant any questions after conducting the field test.

---

waiting in the secondary inspection area, but rather was handcuffed by Agent McGrath when he subsequently arrived to take Defendant to the HSI office.

[5] Defendant initially argued that he was questioned by HSI agents. (Dkt. No. 16 at 6-7). There was, however, no evidence to support this claim. To the contrary, Agent McGrath testified that Defendant was read his Miranda rights; Defendant requested counsel; and no questioning followed. (Hr'g Tr. at 72). Thus, nothing on the record suggests that Defendant made any statements to HSI agents beyond those normally attendant to arrest and custody. *See United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006).

The Court finds that *Kiam* and *St. Vallier* are instructive here. Officer Viveros' questions occurred in the unique border context where "normal *Miranda* rules simply cannot apply . . . ." *Kiam*, 432 F.3d at 529. The determinative question thus becomes whether Officer Viveros "crossed the line" established by the Third Circuit in *Kiam* when he questioned Defendant without providing him with *Miranda* warnings. If Officer Viveros' questions "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the questions crossed the line, and *Miranda* warnings were required. *Id.* at 530; *see also United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015) (finding that *Miranda* warnings were required where CBP officers asked a defendant questions about his involvement with drug activity that "had nothing to do with whether or not to admit [the defendant] into the country."). But if there was simply an overlap between questions relevant to the admissibility of Defendant's bag into the United States and questions relevant to possible criminal conduct, the questions did not cross the line, and no *Miranda* warnings were required. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 Fed. App'x at 657.

Given the objective nature of the inquiry as established in *Kiam* and *St. Vallier*, the Court finds that Officer Viveros' questions were relevant both to Defendant's "admissibility and [to] criminal conduct, while not relating solely to prosecution of the latter . . . ." *Id*. at 657. While Officer Viveros' questions elicited what may be deemed to be inculpatory responses for purposes of criminal prosecution, basic questions about an individual's ownership of luggage and awareness of its contents are fundamental to CBP officers' responsibilities in determining the admissibility of persons and effects into the United States. *Kiam*, 432 F.3d at 530 n.6; *see also United States v. Thomas-Okeke*, 2019 WL 2344772, at *13 (D.V.I. June 3, 2019); *Henry*, 2018 WL 547266, at *11. Indeed, after Officer Viveros asked basic questions of Defendant and the field test confirmed that

the packages in Defendant's bags contained cocaine, the CBP officers ceased questioning of Defendant and requested the assistance of HSI agents.[6] This is precisely the established procedure that the Third Circuit discussed approvingly in *Kiam. Id.* at 530 n.5.

In short, because the routine questions were objectively relevant to Officer Viveros' investigation into Defendant's admissibility, Officer Viveros was not required to provide Defendant with *Miranda* warnings before questioning him. Defendant's arguments to the contrary are rejected and his statements to the CBP officers will not be suppressed on *Miranda* grounds.

    **C.**    **Voluntariness of Defendant's Statements**

Defendant argues that his statements were the "direct result" of "coercive activity" and were thus involuntary and must be suppressed. (Dkt. No. 16 at 6-7). In response, the Government asserts that "Defendant's will was not overborne and that no coercion of any type was utilized." (Dkt. No. 18 at 8).

As a preliminary matter, the Court questions the propriety of a voluntariness argument under the circumstances here. Defendant did not have the right to remain silent as a person seeking entry into the continental United States. *Kiam*, 432 F.3d at 529 (quoting *Gupta*, 183 F.3d at 617) (quotations omitted). An individual must establish his or her admissibility to the country. *See Gupta*, 183 F.3d at 617 ("The United States is entitled to condition entry on willingness to provide essential information."). The fact that questions by CBP officials are "especially understood to be a necessary and important routine" at the border "cuts against the potentially coercive aspect of

---

[6] Following the confirmation of cocaine, Officer Viveros stated to Defendant that the packages contained cocaine. Defendant protested, stating that he thought it was soap that he had purchased from "My Lord." Officer Viveros responded that the substance tested positive for cocaine. Defendant's spontaneous comments did not result from questioning by Officer Viveros. *See United States v. Young*, 233 Fed. App'x 114, 115 (3d Cir. 2007) (holding that a suspect's incriminating statements made immediately after police informed him of the crimes he was being charged with were spontaneous and not a result of custodial interrogation) (citations omitted).

the Customs inquiry . . . ." *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). Defendant had to meet his information production burden, and Officer Viveros was accordingly entitled to ask questions and require answers. Unlike in a context, for example, where *Miranda* applies, the Court is unconvinced that a voluntariness issue arises where—as here—an interaction occurred under normal operations at the border.

Even if a voluntariness analysis applies here, the totality of the circumstances suggests that Defendant's statements were voluntary. *Fenton*, 796 F.2d at 608. While Defendant testified that throughout his encounter with law enforcement there were four or five officers present and he was handcuffed, there is no showing on the record that the officers' presence or the alleged handcuffing created the kind of coercive environment that would render Defendant's statements involuntary. *See United States v. Gonsalves*, 2020 WL 1170217, at *9 (D.V.I. Mar. 10, 2020) (finding that the defendant's statements were voluntary despite the defendant being handcuffed and the presence of five or six officers) (citing *United States v. Kofsky*, 2007 WL 2480971, at *27 (E.D. Pa. Aug. 28, 2007) (finding that while the presence of 23 armed federal agents may function as one indicia of coercion, it is not dispositive)). Additionally, while the setting where the interaction took place was a secondary inspection area, that does not necessarily suggest that Defendant was in an environment so coercive as to render his statements involuntary, particularly in light of the fact that the room was large with three doors and a long window. *Kiam*, 432 F.3d at 530 (citation omitted). In fact, both Officer Viveros and Agent McGrath testified that Defendant appeared relaxed during the encounter. *United States v. Vidal*, 85 F. App'x 858, 863 (3d Cir. 2004) (concluding that a defendant was "not subject to much less overcome by coercive tactics [where] he appeared to be calm and was cooperative throughout the questioning . . . ."); *see also United States v. Joseph*, 2020 WL 974870, at *5 (D.V.I. Feb. 28, 2020). Further, Defendant was not

subjected to repeated or prolonged questioning. *Cf. United States v. Clark*, 2019 WL 3456813, at *12 (D.V.I. July 30, 2019). There is also nothing on the record to suggest that Defendant's age, education, or intelligence would have impacted the voluntariness of his statements. *See United States v. Phillip*, 2020 WL 1102481, at *12 (D.V.I. Mar. 7, 2020).

In sum, even assuming that a voluntariness issue is properly raised here, the Court does not find that coercive police activity—which is necessary for a finding of involuntariness—occurred. *Jacobs*, 431 F.3d at 108. Accordingly, the Court will deny Defendant's Motion on voluntariness grounds as well.

## IV.  CONCLUSION

For the reasons stated above, the Court will deny Defendant's Motion to Suppress, both as to the tangible evidence discovered as the result of the search of Defendant's bags and the statements made by Defendant.

An appropriate Order accompanies this Memorandum Opinion.

Date:    January 7, 2021                    _____/s/_____
                                            WILMA A. LEWIS
                                            Chief Judge